UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

LAWRENCE E. ROBERTSON

v.

THE HOME DEPOT, INC.

CIVIL ACTION

NO. 14-806-JWD-EWD

<u>RULING AND ORDER</u>

This matter comes before the Court on *Home Depot's Motion for Summary Judgment* (Doc. 24) filed by Defendant The Home Depot U.S.A., Inc.  Plaintiff Lawrence Robertson opposes the motion. (Doc. 52-2)[1]  Defendant has filed a reply. (Doc. 44.)  Oral argument is not necessary.  Having carefully considered the law, the facts in the record, and the arguments and submissions of the parties, the Court finds that Defendant's motion should be granted in its entirety, and all of Plaintiff's claims should be dismissed with prejudice.

I.     **Relevant Factual Background**

   A.  **Preliminary Note**

Preliminarily, the Court notes that almost all of the facts in this section are taken from the *Defendant's Statement of Uncontested Facts*. (Doc. 24-1.)  There are four main reasons for this.

First, as the Court explained in its February 17, 2017, Ruling and Order, Plaintiff did not file a statement of contested facts, in violation of Local Civil Rule 56(b). (Doc. 74 at 2–3.)  The problem was exacerbated when the Court gave the Plaintiff an opportunity to re-file those exhibits—and only those exhibits—that had previously been filed, so that Plaintiff could clean up the record. (*See* Doc. 48.)  Contrary to the Court's order, Plaintiff filed, among other

---

[1] Plaintiff's numerous attempts to file oppositions and exhibits have been chronicled elsewhere in the record.  For an extensive review of the procedural history, see the Court's February 17, 2017, Ruling and Order (Doc. 74).

previously unfiled things, an untimely statement of contested facts.  To make matters even worse, Plaintiff misrepresented to the Court that it was an "amended and supplemental" one when no prior statement of contested facts had been filed. (Doc. 74 at 13–14.)  Considering the Plaintiff's violation of the local rules *and* Court order *as well as* his misrepresentations, the Court struck Plaintiff's untimely statement of contested facts and deemed *Defendant's Statement of Uncontested Facts* admitted for purposes of the motion. (Doc. 74 at 13–14.)

Second, most of Plaintiff's exhibits that were filed into the record have been stricken. Because, in violation of the Court's prior order (Doc. 48), the Plaintiff filed exhibits on June 6, 2016, that had not been previously filed into the record (*see* Doc. 74 at 12–16), a large number of exhibits were stricken. (*See* Doc. 78, striking Docs. 54-5, 54-7 (page 4 only), 54-8, 54-11, 55-1, 55-2, 55-3, 55-4, 55-5, 55-6, 56-1, 56-2, & 56-4).)  Plaintiff's audio recordings (Docs. 40-1–4) were later stricken from the record pursuant to Fed. R. Civ. P. 37(c)(1). (*See* Doc. 77.)  Thus, Plaintiff had little evidence remaining in the record to oppose Defendant's motion.

Third, most of Plaintiff's remaining exhibits in the record (Docs. 54-1, 54-2, 54-3, 54-4, 54-6, 54-7 (pages 1–3), 54-9, 54-10, and 40-8) consist of unauthenticated documents.  These cannot be considered for the instant motion. As this Court has stated:

> "To be considered by the court, 'documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.'. . . A document which lacks a proper foundation to authenticate it cannot be used to support a motion for summary judgment." *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc*., 896 F.2d 1542 (9th Cir. 1989). *See also Martin v. John W. Stone Oil Distributor, Inc.,* 819 F.2d 547 (5th Cir. 1987) ("Unsworn documents are . . . not appropriate for consideration [on motion for summary judgment]"); *Moffett v. Jones County,* 2009 WL 1515119 (S.D. Miss., June 1, 2009) ("The records are not certified . . .  nor sworn in any way, thus they are inadmissible"); *Rizzuto v. Allstate Ins. Co.,* 2009 WL 1158677 (E.D. La., April 27, 2009) (same); 10A Charles Alan Wright, *et al., Federal Practice & Procedure* § 2722 (3rd ed.1998).

*Hall v. Johnson*, No. 12-99, 2013 WL 870230, at *1 n. 1 (M.D. La. Mar. 7, 2013).  Thus, because most of Plaintiff's remaining evidence has not been properly authenticated, these exhibits cannot support the Plaintiff's opposition.  Nevertheless, the Court notes that many of these documents were submitted by Home Depot as well, so they have been considered anyway. (*See* Doc. 24-3 at 67–68, 70–71, 73–75, 77–78; Doc. 24-4 at 6–11.)

Fourth, it appears as though Plaintiff has submitted a thirty-eight page part of his deposition that was not struck. (Doc. 56-3.)[2]  However, Plaintiff's memorandum in support does not provide a single citation to the record for any portion of this part of the deposition. (*See* Doc. 51-2)[3]  Without specific citations to the record, the Court will not consider this exhibit.  As the Fifth Circuit has explained:

> When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. *See Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 916 (5th Cir. 1992), *cert. denied,* 506 U.S. 832, 113 S. Ct. 98, 121 L. Ed. 2d 59 (1992). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas,* 136 F.3d at 458; [*Stults v. Conoco, Inc.*, 76 F.3d 651, 657 (5th Cir. 1996)]; *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied,* 513 U.S. 871, 115 S. Ct. 195, 130 L.Ed.2d 127 (1994); *Skotak,* 953 F.2d at 916 n. 7; *see also Nissho–Iwai American Corp. v. Kline,* 845 F.2d 1300, 1307 (5th Cir. 1988) (it is not necessary "that the entire record in the case . . . be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered"); *cf. U.S. v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Because [Plaintiff] did not identify any evidence of damages in his summary judgment response, the evidence was not properly before the district court and will not be considered here.

---

[2] Plaintiff also submitted eleven pages of the index to this deposition that have not been struck. (Doc. 56-5.)  But, of course, this index provides no evidence for the Court to consider.

[3] The deposition excerpt in evidence covers pages 188–226 of Plaintiff's deposition. (Doc. 56-3.)  The only reference Plaintiff makes to specific pages of the deposition in his opposition is on page 19, which cites to "Depo. Pgs. 173-3 to 182-21." (Doc. 51-2 at 19.)

*Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). The same reasoning applies here and leads the Court generally to disregard the portions of Plaintiffs' deposition that have not been stricken.

For these reasons, most of the facts before the Court come from the Defendant's Statement of Uncontested Facts, all of which have been deemed admitted. The Court will now proceed with a recitation of those facts.

### B. Plaintiff's Employment History at Home Depot

Plaintiff, an African-American male, began working for Home Depot in the Baton Rouge area as a sales associate in approximately 2002. (Doc. 24-1 at 1.) After about a year, Plaintiff left Home Depot to work at another retailer. (Doc. 24-1 at 1.)

Plaintiff reapplied at Home Depot in 2005, following his termination by another retailer. (Doc. 24-1 at 1.) Plaintiff was rehired by Home Depot, this time as a Department Supervisor. (Doc. 24-1 at 1.)

In February 2006, Plaintiff was promoted to a Salaried Assistant Store Manager position at Home Depot's North Baton Rouge store on Airline Highway. (Doc. 24-1 at 2.) Plaintiff then transferred to Home Depot's Baton Rouge store on Coursey Boulevard. (Doc. 24-1 at 2.)

Next, Plaintiff transferred to Home Depot's Denham Springs store before ultimately returning to Home Depot's North Baton Rouge store on Airline Highway in 2011. (Doc. 24-1 at 2.) When Plaintiff transferred back to the North Baton Rouge store in August 2011, a Store Manager was not in place. (Doc. 24-1 at 2.)

Shortly after Plaintiff arrived at the North Baton Rouge store, David Gibson became Store Manager of that store and therefore became Plaintiff's direct supervisor. (Doc. 24-1 at 2.)

David Gibson is an African-American male born on June 30, 1964, or nearly ten years before

Plaintiff's, who was born on November 12, 1973. (Doc. 24-1 at 2.)

### C.  Plaintiff and David Gibson

#### 1. Plaintiff's Thoughts as to Why the Relationship Went South

Plaintiff alleges that a few months after Mr. Gibson became the Store Manager of the

North Baton Rouge store, their relationship started going downhill. (Doc. 24-1 at 2.)

Specifically, Plaintiff alleges that one morning when he was responsible for opening the North

Baton Rouge store, there was a rainstorm which caused signs outside to blow over and tree

branches to fall. (Doc. 24-1 at 2.) Plaintiff said he did not send any employees outside to clean

up the front of the store during the storm. (Doc. 24-1 at 2.)

Plaintiff alleges that later that day when the weather calmed down, Mr. Gibson drove up

to the front of the store and saw that "the front [was] kind of in disarray." (Doc. 24-1 at 3.)

Plaintiff alleges that when he met Mr. Gibson outside, Mr. Gibson started to "curse" during the

conversation with Plaintiff because of the condition of the front of the store. (Doc. 24-1 at 3.)

Plaintiff testified "[a]nd I stopped him in his tracks. Don't disrespect – don't curse me when you

are having a conversation with me. If you want to talk to me, you respect me as a man, and I'll

give you respect as a man. Don't curse me. Actually talk to me. Don't do it." (Doc. 24-1 at 3.)

Plaintiff testified that from that point "I think it just went down the line from there. You

know, but he's not going to talk to me any kind of way, and I'm going to sit back and let you do

it." (Doc. 24-1 at 3.) Plaintiff testified that after this occurred, Mr. Gibson stopped doing store

walks with Plaintiff through his departments to offer advice and suggestions and stopped

assigning Plaintiff specific days when he could concentrate on completing specific tasks in his

departments. (Doc. 24-1 at 3.)  Plaintiff also testified that after this incident with Mr. Gibson, Mr.

5

Gibson might see Plaintiff standing in an aisle and would not speak to him and would walk the other way. (Doc. 24-1 at 3.)

## 2. Plaintiff's 2012 Yearly Evaluation

Plaintiff alleges that Mr. Gibson's "personal" attack against him continued with Plaintiff's fiscal year 2012 Performance and Development Summary, or yearly evaluation. (Doc. 24-1 at 3.)  Plaintiff refused to sign the evaluation. (Doc. 24-1 at 4.)  Plaintiff alleges it was contradictory. (Doc. 24-1 at 4.)  Plaintiff also had issues with the following statements in the review:

> Arrogant: Self confident is a great attribute but it can be seen as Arrogant. Lawrence needs to be more approachable and warm to customers and associates, think about his response to customers and associates.

> Arrogant: Self confidence gives off a sense of cold and aloof, makes others feel inferior.

(Doc. 24-1 at 4.)  Plaintiff felt as though this was a "personal attack because it has nothing to do with my work ethics or my performance." (Doc. 24-1 at 4.)  Plaintiff also felt he should have been marked as a "Top Performer" rather than a "Valued Associate" because "[o]nce again, I continued to be one of the best[.]" (Doc. 24-1 at 4.)

Plaintiff admitted his fiscal year 2012 review was for the first full year that he and Mr. Gibson worked together. (Doc. 24-1 at 4.)  Plaintiff also admitted that his review was Mr. Gibson's opinion, even if Plaintiff himself disagreed with it. (Doc. 24-1 at 4.)  Further, in Plaintiff's fiscal year 2012 review, Mr. Gibson noted that he believed Plaintiff would be ready for a Store Manager position "within 1 year if he works on the develop[ment]." (Doc. 24-1 at 4.) The review also contains other positive comments, such as "[k]nows how business works; knowledgeable in current and possible future policies, practices and trends. Is aware of how strategies and tactics work in the marketplace." (Doc. 24-1 at 4.)

6

**3. Plaintiff's July 24, 2013, Disciplinary Notice**

Plaintiff alleges that Mr. Gibson continued his personal attack against him on or around July 24, 2013, when Mr. Gibson issued Plaintiff a discipline notice. (Doc. 24-1 at 4.)  That Progressive Discipline Notice referred to certain performance deficiencies noted by Mr. Gibson, including:

- During week 21/22 receiving associate Lenny went out on an LOA. Lawrence did not react to the situation from a leadership perspective to ensure the receiving DH had the required help to perform his daily duties as well as breakdown pallets of freight which caused a congestion of freight in receiving.

- Lawrence has not displayed the necessary engagement with the day and night Receiving DS's.

- Lawrence's engagement with the Inventory process was substandard. There was a perceived lack of sense of urgency and insufficient follow up on the overhead checklist.

- The Front end score card has been below company standards for the last 3 weeks and Lawrence has not implemented a plan of action to course correct the situation.

- Lawrence has failed to consistently ensure all Will Calls have specific locations and required notes in the system by setting expectations and following up with his team to ensure compliance.

- The Book and Physical report was not worked in over a month leading up to inventory.

(Doc. 24-1 at 5.)  The discipline notice also outlined steps Plaintiff had to take to improve his performance. (Doc. 24-1 at 5.)

Plaintiff alleges that Mr. Gibson allowed three associates to take a weekend off which he alleges led to the shortage of staffing in the receiving department. (Doc. 24-1 at 5.) Plaintiff also denied that the "Front End score card" was below company standards. (Doc. 24-1 at 5.)  Plaintiff refused to sign the discipline notice acknowledging that he received it. (Doc. 24-1 at 5.)

Plaintiff once again alleged that the discipline notice was "personal" in nature. (Doc. 24-1 at 6.)  Plaintiff testified that he believed it went back to Mr. Gibson being threatened by his (Plaintiff's) standing within the company. (Doc. 24-1 at 6.)

### 4. The Berda Cage Issue

More than a week before Plaintiff's counseling of July 24, 2013, Mr. Gibson initiated a call with Home Depot's Associate Advice and Counsel Group ("AACG")[4] regarding a possible integrity issue with one of the hourly associates at the North Baton Rouge store, Berda Cage. (Doc. 24-1 at 6.)  Mr. Gibson noted to the AACG that Ms. Cage had an unusual amount of bad time "punches" from February 2013 through July 2013. (Doc. 24-1 at 6.)

Mr. Gibson was made aware of this abnormality by the District Human Resources Manager, Kevin Kydd, and contacted the AACG for advice as to how to handle the issue. (Doc. 24-1 at 6.) The AACG initiated an investigation of its own, and learned that Ms. Cage would often arrive at work when the store was busy, and would start helping customers before she punched in for work. (Doc. 24-1 at 6.)  The AACG also learned that Ms. Cage had been informed by the bookkeeper of the North Baton Rouge store about the excessive missed time punches and that she needed to make sure to punch in when she arrived at work. (Doc. 24-1 at 6.)

Plaintiff was interviewed regarding Ms. Cage's missed punches. (Doc. 24-1 at 6.)  In that interview and in a follow-up email sent by Plaintiff on July 25, 2013 to an AACG representative, Plaintiff confirmed that Ms. Cage would often report to work and before clocking in, would see the Home Depot service desk backed up and would begin working before clocking in. (Doc. 24-1 at 7.)

---

[4] "The AACG is Home Depot's centralized Home Resources call center located at Home Depot's Store Support Center in Atlanta, GA.  It is staffed with human resources managers who are available to counsel with managers and supervisors and associates regarding any work-related issues." (Doc. 24-4 at 3 n. 1.)

On July 27, 2013, the AACG recommended that Ms. Cage be counseled for "working off the clock." (Doc. 24-1 at 7.)

On the same day, the AACG also recommended that Plaintiff be counseled for " ' . . . directing, allowing, suggesting or asking an associate to work off the clock.' The OASM (Plaintiff) knew the DH was working off the clock as evidenced by his interview and written statement." (Doc. 24-1 at 7.)  The AACG relayed this recommendation to Mr. Kidd. (Doc. 24-1 at 7.) However, before Plaintiff could be counseled, he went on vacation and then on a leave of absence. (Doc. 24-1 at 7.)

### D.  Plaintiff's Pre-Leave Email

Around the time of the Berda Cage investigation and Plaintiff's July 25, 2013 email regarding Ms. Cage, Plaintiff went on vacation. (Doc. 24-1 at 7.)  He returned to work for one day and then went on FMLA leave for "stress behind work" and due to his mother's poor health. (Doc. 24-1 at 7.)

On July 31, 2013, before Plaintiff went on FMLA leave, he sent an email to Frank Blake (Home Depot's CEO at the time), Marvin Ellison (Home Depot's COO at the time) and Ann Marie Campbell (a Home Depot Divisional President at the time). (Doc. 24-1 at 7.)  In that email, Plaintiff alleges that the Store Manager, David Gibson, and the District Team had "personal vendettas" against him. (Doc. 24-1 at 8; Doc. 24-3 at 70.)  Plaintiff referred to the alleged cursing incident with Mr. Gibson outlined above. (Doc. 24-1 at 8.)  Plaintiff stated in the email that "from that point everything became personal." (Doc. 24-1 at 8; Doc. 24-3 at 70.)  Plaintiff then referenced his annual review, and stated "[w]hen I received my review, it was based off of personal feelings versus being based off of my store performance and the District Team had a major impact on the review as well." (Doc. 24-1 at 8; Doc. 24-3 at 70.)

Plaintiff also complained about the discipline notice he received on July 24, 2013.  (Doc. 24-1 at 8.)  Plaintiff asked that the discipline counseling be removed, that his review be rewritten "without any personal attacks" and that he be allowed to transfer stores, alleging that there was no growth for him at the North Baton Rouge store. (Doc. 24-1 at 8; Doc. 24-3 at 71.) This was the first time Plaintiff asked for a transfer from the North Baton Rouge store. (Doc. 24-1 at 8.)

As admitted by Plaintiff, he did not mention anywhere in this email that he felt he was being mistreated on the basis of his race, age or gender. (Doc. 24-1 at 8.) Plaintiff testified that he "didn't feel a need to" mention that he felt he was being mistreated on the basis of his race, age or gender. (Doc. 24-1 at 8.)

Plaintiff testified that he was contacted by Ms. Campbell and was told Home Depot was investigating the allegations. (Doc. 24-1 at 8.)

### E.  Plaintiff's FMLA Leave and Return from FMLA Leave

#### 1. Plaintiff Returns to Work

Shortly after Plaintiff sent his email on July 31, 2013, he went on FMLA leave. Plaintiff did not have any issues procuring FMLA leave. (Doc. 24-1 at 9.)  Plaintiff submitted his FMLA leave paperwork and was granted leave. (Doc. 24-1 at 9.)  When Plaintiff was ready to return to work from his FMLA leave, he provided Mr. Gibson with his return-to-work documentation and was allowed to begin working again immediately. (Doc. 24-1 at 9.)

#### 2. Plaintiff's Disciplinary Notice

Plaintiff alleges that on the day he returned to work, Mr. Gibson issued him a discipline notice for the Berda Cage "missed punches investigation." (Doc. 24-1 at 9.)  As outlined above, the AACG had recommended that Ms. Cage and Plaintiff be counseled, Ms. Cage for not clocking in before she began her shift and Plaintiff for knowingly allowing her do to so. (Doc.

24-1 at 9.)  However, Plaintiff went on leave before a counseling could be issued to him. (Doc. 24-1 at 9.)

Plaintiff stated that when Mr. Gibson counseled him regarding the missed punches investigation, Reginald Wells, the Store Manager at the Denham Springs store, witnessed the counseling. (Doc. 24-1 at 9.)  Plaintiff admitted to telling Mr. Gibson that he was "full of it" (and possibly "full of shit") and admitted to walking out of the room during the meeting. (Doc. 24-1 at 9.) Plaintiff went back into the meeting at the urging of Mr. Wells. (Doc. 24-1 at 9.)  Plaintiff refused to sign the discipline notice. (Doc. 24-1 at 9.)

### 3. Plaintiff's Second Email to Corporate

Soon after Plaintiff was issued the discipline notice due to the missed punches investigation, Plaintiff sent another email to the corporate office. (Doc. 24-1 at 10.)  Plaintiff testified that he sent this shortly after he was counseled. (Doc. 24-1 at 10.)  Plaintiff sent this October 16, 2013, email to Mr. Ellison, Mr. Blake and Ms. Campbell, along with Pamela Holland (African-American female), the Regional Human Resources Director, and Tim Wilkerson (African-American male), the Regional Vice President. (Doc. 24-1 at 10.)

Plaintiff again complained about Mr. Gibson, alleging that Mr. Gibson "does not care about anyone or anything but himself." (Doc. 24-1 at 10; Doc. 24-3 at 74.)  Plaintiff called Mr. Gibson unprofessional, and alleged that he was "being targeted and harassed by my Store Manager and it is a hostile work environment for me." (Doc. 24-1 at 10; Doc. 24-3 at 74.) Plaintiff then asked for a transfer to another store. (Doc. 24-1 at 10; Doc. 24-3 at 75.)

Once again, Plaintiff did not mention anywhere in this email that he felt he was being mistreated on the basis of his race, age or gender. (Doc. 24-1 at 10; Doc. 24-3 at 74–75.) Plaintiff testified that there was "no need to" raise those alleged concerns. (Doc. 24-1 at 10.)

### 4. Consequence of the Second Email to Corporate

In response to Plaintiff's email, Plaintiff was granted a transfer to the Denham Springs, Louisiana store. (Doc. 24-1 at 10.)  In addition, both Ms. Cage's and Plaintiff's discipline notices were rescinded. (Doc. 24-1 at 10.) Home Depot learned that while Ms. Cage was beginning to work before she clocked in, she was compensated for all time worked as she completed a time and attendance change form to add the time back for all missed punches. (Doc. 24-1 at 11.)

### F.  Plaintiff's Time at the Denham Springs Store

### 1. Plaintiff's Time There Generally and His Supervisor

Plaintiff transferred to the Denham Springs store on or around October 28, 2013. (Doc. 24-1 at 11.)  The Denham Springs store was a store to which Plaintiff requested a transfer. (Doc. 24-1 at 11 (Q: Did you tell him that the Denham Springs store was a store you would be interested in transferring to? A: Yes. I told him that or Coursey.).)

Reginald Wells (black male, date of birth 9/18/71) was the Store Manager of the Denham Springs store at the time. (Doc. 24-1 at 11.) Mr. Wells would walk the store with Plaintiff when asked and Plaintiff could ask questions of Mr. Wells. (Doc. 24-1 at 11.) Plaintiffs' relationship with Mr. Wells was better than his relationship with Mr. Gibson. (Doc. 24-1 at 11.)

### 2. The Incidents with Sabrina Allen

On December 12, 2013, Home Depot's Awareness Line received an anonymous complaint from an employee that Plaintiff had "violated the personal space of the caller. The caller did not want to mention any further details to retain his/her anonymity; however, Lawrence made him/her very uncomfortable. Nothing to this extreme has taken place before but

he/she feels that Lawrence's behavior was a bit too casual for the workplace." (Doc. 24-1 at 11; Doc 24-4 at 6.)  The AACG began to investigate the allegations. (Doc. 24-1 at 11.)

While the AACG investigated the allegations, the Awareness Line received another phone call from the same employee regarding more inappropriate conduct by Plaintiff. (Doc. 24-1 at 12.) Specifically, the employee, Sabrina Allen, alleged that on December 19, 2013, "[Plaintiff] grabbed ALLEN's ponytail and began playing around with it while ALLEN was servicing customers at the self-checkout lane. ALLEN felt this was incredibly inappropriate. She asked that Lawrence stop, but he did not. Eventually, Lawrence stopped after ALLEN continued to try moving away from him." (Doc. 24-1 at 12; Doc. 24-4 at 9).

Due to this, the AACG instructed Mr. Wells to have Plaintiff draft a statement. (Doc. 24-1 at 12.)  In that statement, Plaintiff only referenced the December 12, 2013, incident, and stated "[a]s I was walking in the break room preparing to go to lunch, myself and a few other associates were in there (including DS (department supervisor), Angie Pierre-Dunaway) and jokingly I ruffled cashier Sabrina's hair. It was just a joke and I didn't mean to be in any way disrespectful. Everyone including Sabrina was laughing and took it as a joke." (Doc. 24-1 at 12; Doc 24-3 at 77.)  Plaintiff testified that "ruffling" meant rubbing his hands on top of Ms. Allen's head. (Doc. 24-1 at 12.)

However, as noted above, Plaintiff again touched Ms. Allen inappropriately on December 19, 2013, and this time, the incident was recorded on closed circuit television. (Doc. 24-1 at 12.) Defendant submitted a recording of that incident as Exhibit C. (Doc. 24-1 at 12.)  The video clearly shows a woman approaching the self-service cash registers with a male following her. (Doc. 24-5.) The male then pulls hard on the woman's head, jerking her head. (Doc. 24-5.) The woman tried to walk away twice from the male, but the male rubbed her hair a few times,

pursued her as she was trying to walk away, and continued bothering her. (Doc. 24-5.) Finally, after handing something back to the female, the male walked away. (Doc. 24-5.) The female then spent time fixing her hair. (Doc. 24-5.) The entire video lasted about two minutes.  (Doc. 24-5.)

Plaintiff admitted that he was the individual captured on the video. (Doc. 24-1 at 12.) Plaintiff testified that on this occasion, he pulled Plaintiff's scrunchee out of her hair.  (Doc. 24-1 at 13.)  Plaintiff has not rebutted the statement of uncontested fact (which appears evident from the video) that "The recording clearly shows Plaintiff pulling the scrunchee out of Ms. Allen's hair." (Doc. 24-1 at 13.)  Nor has the Plaintiff rebutted that "The recording also shows Plaintiff rubbing his hands back and forth through Ms. Allen's hair as she tried to back away." (Doc. 24-1 at 13; Doc. 24-6 at 7–18.)  Finally, the recording further captures Plaintiff offering the scrunchee back to Ms. Allen then pulling it away on several occasions, all while Ms. Allen was assisting a customer in the self-checkout line. (Doc. 24-5; Doc. 24-6 at 22–29.)  Plaintiff admitted that if an employee such as Ms. Allen complains of inappropriate conduct of a co-employee, that conduct should be investigated. (Doc. 24-1 at 13.)

### 3. Plaintiff's Termination, Statements about His Alleged Discrimination, and Lack of Replacement.

Ultimately, the AACG reviewed the recording on closed circuit television of the incident and recommended that Plaintiff's employment be terminated for violation of Home Depot's Acceptable Workplace Conduct and Behavior Policy. (Doc. 24-1 at 13.) Plaintiff was terminated on December 27, 2013, for violation of Home Depot's Respect Policy in relation to his conduct towards Ms. Allen. (Doc. 24-1 at 13.)

Plaintiff admitted that during his entire employment at Home Depot, no employees of Home Depot ever mentioned anything about his race, his gender or his age. (Doc. 24-1 at 13; Doc 24-3 at 18–19.) In fact, when asked in his deposition "did you think that [Mr. Gibson's]

14

issues with you were just personal," Plaintiff responded "I think it was personal." (Doc. 24-1 at 13; Doc. 24-3 at 20.)   Regarding Mr. Gibson, Plaintiff testified "I don't think his issues with me were dealing with race. No." (Doc. 24-1 at 14; Doc. 24-3 at 20.)  Plaintiff also testified at one point that he did not feel he was discriminated against because of his gender." (Doc. 23-1 at 14; Doc. 23-3 at 11 (Q: What about gender? Do you feel like you were discriminated against because you were a male? A: I wouldn't say that.).)

Plaintiff also testified "Like I say, I was respected a lot as an ASM at Home Depot through the whole district. Everyone knew the type of work that I carried out. I think that was intimidating having a younger male. I was younger than him and knew more than he knew." (Doc. 24-1 at 14; Doc. 24-3 at 21.)

Plaintiff testified that he believed that Mr. Gibson felt threatened by him because of his abilities and the respect he alleges he had throughout the district. (Doc. 24-3 at 21.)  When asked, "So not necessarily related to your gender or age. Right?", Plaintiff replied, "Me being a younger black male. Yes." (Doc. 24-3 at 21.)

Plaintiff was not replaced after his termination. (Doc. 24-3 at 14.)  At the time of Plaintiff's termination, the Denham Spring store was technically over head count on Assistant Store Managers, meaning the Denham Springs store had more Assistant Store Managers than a store of its size would usually have. (Doc. 24-3 at 14.)  Therefore, Plaintiff's duties were assumed by the two other Merchandising Assistant Store Managers in the Denham Springs store, Jermaine Antoine (African-American male, date of birth 2/3/77) and Carl Denmark (Caucasian male, date of birth 5/9/71). (Doc. 24-3 at 14.)  No additional Assistant Store Managers were hired, promoted or transferred from another store to replace Plaintiff. (Doc. 24-3 at 14.)

### G. Plaintiff's Retaliation Allegations

Plaintiff testified that he believes he was retaliated against for drafting the two emails to the corporate office, one in July 2013 and one in October 2013. (Doc. 24-3 at 15; Doc. 24-3 at 62.) Plaintiff's testified that he does not believe he was retaliated against for any other reason. (Doc. 24-3 at 15; Doc 24-3 at 62.)

Specifically, when asked if he believed he was retaliated against for taking FMLA leave, Plaintiff responded "I don't believe I was being retaliated because I took leave." (Doc. 24-3 at 15.) [5]  As outlined above, neither of Plaintiff's emails to corporate alleged that he was being harassed or mistreated because of his race, sex or age (he was 39 when the emails were sent). (*See* Doc. 24-3 at 70–75.)

## II.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . .  [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)

---

[5] Plaintiff did not timely contest this fact, so it is deemed admitted.  Nevertheless, the Court notes that Defendant cited to this as being on page 189 of the deposition, but the quote is actually on the following page 190 in the same line of questioning, which was included in Plaintiff's submissions. (*See* Doc. 56-3 at 3.)  The Court will overlooked the Defendant's slight typo, as it is considerably different than Plaintiff's complete failure to cite to any part of the Plaintiff's deposition that remains in evidence.

(citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## III.    Plaintiff's Discrimination Claims

### A.  Standards under Title VII, § 1981, and ADEA

Title VII provides in relevant part that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The summary judgment test for discrimination claims under § 1981 is the same as the test for discrimination claims under Title VII." *Riley v. Sch. Bd. Union Par.*, 379 F. App'x 335, 339 (5th Cir. 2010) (citing *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir.2004)). Where the plaintiff "does not allege any direct evidence of discrimination, [courts] apply the familiar *McDonnell Douglas* burden-shifting analysis." *Id.* (citing *Davis*, 383 F.3d at 316).

"To survive summary judgment under *McDonnell Douglas,* the plaintiff must first present evidence of a prima facie case of discrimination." *Id.* (citing *Davis*, 383 F.3d at 317). "If the plaintiff presents a prima facie case of discrimination, then an inference of discrimination arises, and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the underlying employment action." *Id.* (citing *Davis*, 383 F.3d at 317). "If the employer is

17

able to state a legitimate rationale for its employment action, the inference of discrimination disappears and the plaintiff must present evidence that the employer's proffered reason was mere pretext for racial discrimination." *Id.* (quoting *Davis*, 383 F.3d at 317).

A plaintiff "may establish pretext by showing that a discriminatory motive more likely motivated [the employer's] decision or that [the employer's] proffered justification is unworthy of credence." *Burton v. Texas Dep't of Criminal Justice*, 584 F. App'x 256, 257 (5th Cir. 2014) (citations omitted).  "To raise an inference of discrimination, the plaintiff may compare his treatment to that of nearly identical, similarly situated individuals." *Riley*, 379 F. App'x at 339 (citing *Bryant v. Compass Group USA Inc.,* 414 F.3d 471, 478 (5th Cir. 2005)). "To establish disparate treatment, however, a plaintiff must show that the employer 'gave preferential treatment to another employee under 'nearly identical' circumstances."  *Id.* (citing *Bryant,* 414 F.3d at 478).  "Alternatively, '[a]n explanation is false or unworthy of credence if it is not the real reason for the adverse employment action.' " *Id.* (quoting *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). "However, a plaintiff cannot prove that an employer's proffered reason is pretextual merely by disputing the correctness of the employer's decision." *Burton*, 584 F. App'x at 257 (citation omitted). "[I]n conducting a pretext analysis, we do not engage in second-guessing of an employer's business decisions.  Title VII does not require employers to make correct decisions, only nondiscriminatory decisions." *Burton*, 584 F. App'x at 258.

The ADEA "prohibit[s] employers from discharging or otherwise discriminating against any individual because of his or her age." *Palacios v. City of Crystal City, Tex*., 634 F. Appx. 399, 401 (5th Cir. 2015) (citations and quotations omitted). "Under the ADEA, it is unlawful for an employer 'to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age.' " *Id.* (quoting 20 U.S.C. § 623(a)(1)).   Like Title VII, the

ADEA also employs the *McDonnell Douglas* standard when, as here, circumstantial evidence is used, but the plaintiff's ultimate burden is different. *Id.* at 402. Unlike Title VII, where the question is whether the protected status is a "motivating factor" in the challenged decision, *see, supra*, "[t]o establish a claim under the ADEA, '[a] plaintiff must prove by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision.' " *Id.* at 401 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78, 129 S. Ct. 2343, 174 L. Ed .2d 119 (2009)).

### B. Analysis

The Court finds that Plaintiff has failed to sustain his burden of showing a genuine issue of material fact as to whether there was discrimination on the basis of race, gender, or age. In sum, the Plaintiff has failed to satisfy his *prima facie* burden with respect to the write ups, and he has not demonstrated pretext for the wrongful termination claim.

### 1. The Write-Ups

With respect to the write-ups, the Court agrees with the Defendant that the Plaintiff has not established a *prima facie* case. One of the requirements for the *prima facie* case is that the plaintiff suffered an "adverse employment action." *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407 (1993). "Under Title VII, an adverse employment action must be an 'ultimate employment decision,' such as 'hiring, granting leave, discharging, promoting, or compensating.' " *Simmons-Myers v. Caesars Entm't Corp.*, 515 F. App'x 269, 275 (5th Cir. 2013) (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir.2007)). "Title VII does not cover 'every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.' " *Id.* (quoting *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir.2003)). Thus, in *Simmons-Myers,* the Fifth

Circuit found that, even if the issue had been properly raised on appeal, written warnings given to the employee did "not constitute materially adverse actions under this standard[.]" *Id.*

Though dicta and not binding, the Court finds *Simmons-Myers* highly persuasive here. Under the facts of the present case, the few warnings Plaintiff received—none of which adversely affected compensation or resulted in discharge, and the worst of which was rescinded before Plaintiff experienced any adverse consequences—do not constitute "ultimate employment decisions" as contemplated by Title VII and the ADEA. As a result, to the extent Plaintiff made a claim for discrimination based on the written warnings, it is dismissed with prejudice. *See also Preston v. Texas Dep't of Family & Protective Servs.*, 222 F. App'x 353, 358 (5th Cir. 2007) ("Written admonishments do not rise to the level of ultimate employment actions."); *Roberson v. Game Stop/Babbage's*, 152 F. App'x 356 (5th Cir. 2005) (noting the Fifth Circuit's "warning . . . not to expand the definition of adverse employment action to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee-anything that might jeopardize employment in the future." (citations omitted)); *Luckman v. United Parcel Serv.*, 44 F. App'x 651 (5th Cir. 2002) (per curiam) (holding that Plaintiff's "written warnings" did not constitute "adverse employment actions").

In his opposition, Plaintiff attempts to satisfy his burden of proving an adverse employment action in a few ways, but each of these fails for the same reason: a lack of evidence. First, Plaintiff claims that Gibson's "evaluations delayed [Plaintiff's] ability to promote [sic] to the position of store manager for at least one year" when he "was expected [to] rise through the ranks and had been placed on the fast track to promotions in upper management and been named a Top Performer." (Doc. 51-2 at 1, 5, 7, & 13.) But there is simply no admissible summary judgment evidence to support these contentions.

20

Second, Plaintiff asserts that these disciplinary actions resulted in a transfer to another store where his position was "superfluous" (Doc. 51-2 at 3, 5, & 14.)  "[T]o be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Alvarado v. Texas Rangers*, 492 F.3d 605, 613 (5th Cir. 2007) (citations omitted).  However, Plaintiff fails to demonstrate that here.  Though he complains in his opposition that his position at the Denham Springs store provided less room for advancement, Plaintiff again has provided no admissible evidence to show that this position was "objectively worse" than his previous position.  Without more, Plaintiff has not demonstrated an adverse employment action.[6]

In sum, the write-ups are not adverse employment actions.  As a result, to the extent Plaintiff makes a discrimination claim related to them, summary judgment is granted, and these claims are dismissed.

### 2. Plaintiff's Termination

The heart of this case lies in the Plaintiff's claim for unlawful termination.  Though Defendant attacks one part of the *prima* facie case, the Court finds that, even assuming that Plaintiff had met this burden, Plaintiff fails to rebut Defendant's legitimate, nondiscriminatory reasons for his termination or offer sufficient evidence supporting a claim of discrimination under Title VII or the ADEA. *See McDaniel v. Temple Independent School Dist.*, 770 F.2d 1340, 1346 n. 2 (5th Cir. 1985) ("[w]here the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." (citation omitted)).

---

[6] The Court notes in passing that the uncontested facts demonstrate that Plaintiff requested the transfer generally and to the Denham Springs store specifically. (Doc. 24-1 at 8, 10, & 11; Doc. 24-3 at 75.)

Here, the Defendant has identified a legitimate, non-discriminatory reason for Plaintiff's termination: Plaintiff's conduct toward Ms. Allen.  "[I]nappropriate behavior can constitute legitimate, non-retaliatory reasons for a termination." *Matthews v. City of Hous. Fire Dep't*, 609 F. Supp. 2d 631, 646 (S.D. Tex. 2009) (citing *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007); *Turner v. Claims Admin. Corp.*, 993 F. Supp. 982, 987 (W.D. Tex. 1998) (finding that "inappropriate language and conduct" and "offensive behavior," which included dropping his pants to tuck in his shirt and making a co-worker  "uncomfortable by getting 'too close,' " constituted a legitimate, non-discriminatory reason for termination). Another legitimate, non-discriminatory reason for termination can be an employee's violation of company policy. *See Ng-A-Mann v. Sears, Roebuck & Co.,* 627 F. App'x 339, 341 (5th Cir. 2015).  Defendant has thus sustained its burden of production for this part of the *McDonnell Douglas* analysis.

Consequently, Plaintiff had the burden of proving pretext.  Again, for the race and gender claims under Title VII, Plaintiff had to prove "that a discriminatory motive more likely motivated [the employer's] decision or that [the employer's] proffered justification is unworthy of credence." *Burton*, 584 F. App'x at 257.  The Plaintiff has done neither.

First, Home Depot's explanation is not "unworthy of credence."  The unrebutted evidence shows that Defendant received two complaints about Defendant engaging in inappropriate behavior.  In the first, an anonymous employee said that Defendant "violated [her] personal space" and that he made her feel "very uncomfortable" because Plaintiff was "a bit too casual for the workplace." (Doc. 24-1 at 11; Doc. 24-4 at 6.)  In the second, Allen identified herself and complained that Plaintiff "grabbled [her] ponytail and began playing around with it while [she] was servicing customers at the self-checkout lane." (Doc. 24-1 at 12; Doc. 24-4 at 9).

"ALLEN felt this was incredibly appropriate.  She asked that [Plaintiff] stop, but he did not. Eventually Lawrence stopped after ALLEN continued to try moving away from him." (Doc. 24-1 at 12; Doc. 24-4 at 9).

The uncontroverted evidence also shows that Defendant did not merely accept these complaints as true or deny Defendant a chance to defend himself.  Defendant gave Plaintiff an opportunity to draft a statement. (Doc. 24-1 at 12.)  Plaintiff did not address the second incident. (Doc. 24-1 at 12; Doc. 24-3 at 77.)  With respect to the first, although Plaintiff denied malicious intent, he admitted that he "ruffled cashier Sabrina's hair." (Doc. 24-1 at 12; Doc. 24-3 at 77.)

Perhaps most importantly, the Court reviewed the video recording of the incident. (Doc. 24-1 at 13.)  The video was described in detail above, and that need not be repeated here.  In short, it confirms Allen's entire account of the incident.  Allen acted extremely inappropriately. Considering the two complaints and video evidence, no reasonable jury would conclude that Home Depot's reason for termination was not worthy of credence or that Defendant did anything other than act in good faith in investigating and responding to Allen's complaint.  Phrased another way, there is no genuine issue of material fact that Home Depot's justification for termination was not the "real reason" for the action or that discrimination was.

Second, Plaintiff has not established that race or sex was a motivating factor in Home Depot's decision.  Plaintiff has produced absolutely no evidence indicating that anyone involved in the Sabrina Allen incident in any way considered the Plaintiff's sex or race in reaching its decision.  Further, Plaintiff admitted that during his entire employment at Home Depot, no employees of Home Depot ever mentioned anything about his race, his gender or his age. (Doc. 24-1 at 13; Doc 24-3 at 18–19.)  Lastly, there has been no showing by the Plaintiff that Defendant "gave preferential treatment to another employee under 'nearly identical'

circumstances." *Riley*, 379 F. App'x at 339.  Indeed, there is no evidence that anyone at Home Depot did anything comparable to what Plaintiff did to Allen yet was not terminated—that is, that an employee was not fired after being caught on video acting extremely inappropriately to another employee and after the victim claimed "physical[] harass[ment]" and stated that she was "considering speaking with a lawyer should the company not take effective action immediately." (Doc. 24-4 at 9.)  Consequently, summary judgment on Plaintiff's discrimination claims under Title VII is warranted.

The same reasoning warrants dismissal of Plaintiff's discrimination claim under the ADEA.  As stated above, for the ADEA, Plaintiff has to prove that "age was the 'but-for' cause of the challenged employer decision.' " *Palacios*, 634 F. Appx at 401 (quoting *Gross*, 557 U.S. at 177–78, 129 S. Ct. 2343).  He has not done so.  Again, the Plaintiff has not proven that the Defendant's explanation for termination was unworthy of credence.  Moreover, Plaintiff admitted that during his entire time with the Defendant, none of the other employees ever mentioned anything about age (Doc. 24-1 at 13; Doc 24-3 at 18–19), and there's no evidence of disparate treatment.  In short, Plaintiff has identified no evidence in the record indicating that age was the "but-for" cause of termination.

The only remotely relevant arguments Plaintiff makes in his lengthy opposition are as follows:

(1) that Home Depot violated its own policies by firing him for a "minor violation" that "at most" would "subject [Plaintiff] to counselling and not termination" (Doc. 51-2 at 3, 6, 20);

(2) that Defendant accepted the "vague and unsubstantiated allegations" of "a young white female in her earlier twenties" over his (Doc. 51-2 at 1, 15);

(3) that Gibson was attacking Plaintiff "for seemingly purely personal reasons" (Doc. 51-2 at 7); and

(4) that Plaintiff was just engaged in "innocuous and perhaps silly horseplay," "light-hearted teasing," and "light-hearted joking around" with Allen; that he just "ruffled [her] hair just as he would an impudent child's;" that "[h]e did not flirt with her, or proposition her;" and that the AACG took Allen's complaint and "progressively rewrote the allegations as being sexual harassment against Sabrina Allen and other female associates." (Doc. 51-2 at 6, 14, 19, 20).

The Court rejects each of these arguments as being unsupported by the record. Concerning the first, Plaintiff submits *no admissible evidence* that would lead to the conclusion that that Defendant violated its own policies in terminating the Plaintiff for the Sabrina Allen incident. To the contrary, the only evidence in the record shows that this action was consistent with such policies (and was in fact entirely reasonable). (Doc. 24-4 at 3; Doc. 24-5.)

Equally important, " '[a] defendant's failure to follow its own policy is not probative of discriminatory animus in absence of proof that the plaintiff was treated differently than other non-minority employees because Title VII does not protect employees from the arbitrary employment practices of their employer, only their discriminatory impact.' " *Turner*, 476 F.3d at 346 (quoting *Upshaw v. Dallas Heart Group*, 961 F. Supp. 997, 1002 (N.D.Tex.1997)) ("[Employee] has introduced no evidence suggesting that [the employer] adhered to its disciplinary policies differently in cases involving non-minority employees. Therefore, [employer's] alleged failure to follow its policy does not serve to establish pretext."); *Palacios*, 634 F. App'x at 404 (citing *Turner*) (applying rule in ADEA cases). As explained above, there is no evidence that Plaintiff was treated differently from similarly situated employees with respect to his termination or with respect to Home Depot's policies. Consequently, Plaintiff's first argument fails.

So does his second. As demonstrated above, the uncontested facts show that the Defendant did not merely accept Allen's word; Home Depot conducted a good-faith

investigation into the matter and reviewed the video, which in fact confirms Allen's account. Again, Plaintiff's argument has no support in the record.

Third, even accepting as true Plaintiff's contentions about Gibson having a personal vendetta against him, this does not warrant denial of summary judgment.  Preliminarily, there is nothing in the record indicating that Gibson had anything to do with Plaintiff's termination.  But putting that aside, there is simply no racial, gender, or age component to Gibson's alleged hostility. Plaintiff stated numerous times (at his deposition, in his emails to corporate, and in his opposition) that he believed Gibson had a personal vendetta against Plaintiff.  But:

- Regarding Mr. Gibson, Plaintiff testified "I don't think his issues with me were dealing with race. No." (Doc. 24-1 at 14; Doc. 24-3 at 20.)

- Plaintiff also testified at one point that he did not feel he was discriminated against because of his gender." (Doc. 23-1 at 14; Doc. 23-3 at 11 (Q: What about gender? Do you feel like you were discriminated against because you were a male? A: I wouldn't say that.).)

- Lastly, Plaintiff testified "Like I say, I was respected a lot as an ASM at Home Depot through the whole district. Everyone knew the type of work that I carried out. I think that was intimidating having a younger male. I was younger than him and knew more than he knew." (Doc. 24-1 at 14; Doc. 24-3 at 21.)

Without more, the Court cannot find that the decision to terminate Plaintiff was motivated by race or gender or that age was the but-for cause of his termination.

And fourth, the Court rejects the Plaintiff's attempt to downplay—and potentially victim-blame—what he did to Allen.  The video speaks for itself.  No reasonable juror could conclude that Plaintiff did anything other than act extremely inappropriately to Allen.  There is no genuine issue of fact on this issue.

In sum, Plaintiff has failed to demonstrate either that Defendant's explanation is unworthy of credence, that race or gender was a motivating factor in its decision, or that age was the but-for cause of his termination.  Given the facts in the record, all reasonable jurors would

conclude that Plaintiff was fired for his inappropriate conduct toward Sabrina Allen, not because of age or out of a motivation of racial or sexual discrimination.  As a result, Plaintiffs' claims for discrimination under Title VII and the ADEA are dismissed with prejudice.

### IV.   Plaintiff's Retaliation Claims

#### A.  Title VII and ADEA

Retaliation claims under Title VII are also analyzed under the *McDonnell Douglas* standard. *See Davis v. Dallas Indep. Sch. Dist.*, 448 F. App'x 485, 492 (5th Cir. 2011). "A plaintiff may establish a prima facie case of retaliation by demonstrating that: '(1) she participated in a Title VII protected activity, (2) she suffered an adverse employment action by her employer, and (3) there is a causal connection between the protected activity and the adverse action." *Id.* (quoting *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 331 (5th Cir.2009)). "Summary judgment is appropriate if the plaintiff cannot support all three elements."  *Id.* (quoting *Stewart*, 586 F.3d at 331.)

Here, Defendant contests the first and third part of Plaintiff's *prima facie* burden. Concerning the first, "[a]n employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Id.* (quoting *Dixon v. Moore Wallace, Inc.*, 236 F. App'x 936, 937 (5th Cir.2007); 42 U.S.C. § 2000e–3(a).   As the Fifth Circuit has explained:

> We have consistently held that a vague complaint, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity. *See, e.g., Tratree v. BP N. Am. Pipelines, Inc.,* 277 Fed. Appx. 390, 395 (5th Cir. 2008) ("Complaining about unfair treatment without specifying why the treatment is unfair . . . is not protected activity."); *Harris–Childs v. Medco Health Solutions, Inc.,* 169 Fed. Appx. 913, 916 (5th Cir. 2006) (affirming summary judgment on retaliation claim where plaintiff never "specifically complained of racial or sexual harassment, only harassment"); *Moore v. United Parcel Serv.,*

> *Inc.,* 150 Fed. Appx. 315, 319 (5th Cir. 2005) ("Moore . . . was not engaged in a
> protected activity, as his grievance did not oppose or protest racial discrimination
> or any other unlawful employment practice under Title VII."); *see also Evans v.*
> *Tex. Dep't of Transp.,* 547 F. Supp. 2d 626, 654 (E.D. Tex. 2007) ("Plaintiff has
> not shown that she engaged in a statutorily protected activity. Specifically,
> although Evans complained of a purportedly hostile work environment, at no time
> did she suggest that [the conduct at issue] was related to Evan's race, sex, . . . or
> other characteristic protected by Title VII.").

*Davis*, 448 F. App'x at 493.  Thus, in *Davis*, when the Plaintiff stated in a meeting that a

supervisor "created a 'hostile work environment," the Fifth Circuit found that that did "not itself

constitute 'protected activity' within the meaning of Title VII, as this complaint lacked a racial or

gender basis." *Id.* (citing 42 U.S.C. § 2000e-3(a)).

Here, the Plaintiff has asserted that he was retaliated against for drafting the two emails to

the corporate office in July 2013 and in October 2013. (Doc. 24-3 at 15; Doc. 24-3 at 62.)

Plaintiff's stated that he did not believe he was retaliated against for any other reason. (Doc. 24-3

at 15; Doc 24-3 at 62.)

The Court has carefully reviewed these letters (Doc. 24-3 at 70–71, 73–75) and finds that

no reasonable juror could conclude that Plaintiff engaged in any protected activity in either letter.

As a result, summary judgment on Plaintiff's retaliation claims under Title VII and the ADEA is

warranted.

Again, in the first letter, Plaintiff stated that the "store manager and District Team have

personal vendettas against me and it clearly shows;" that after the "Front Apron" incident,

"everything became personal;" and that, "[w]hen [he] received [his] review, it was based off of

personal feelings versus being based off of [his] store performance." (Doc. 24-3 at 70.)  Plaintiff

concluded:

> So, after all this I am just asking that this documentation to be taken out of my file
> and my review to be rewritten without any personal attacks and to be more

professional.  I am also requesting a transfer, because I have been at this store for over two years and there is no growth for me.

(Doc. 24-3 at 71.)

Similarly, the second email refers only to a personal vendetta without any reference to race or gender.  This email states: "So, at this point of my career, I am working with a store manager who does not care about anyone or anything but himself." (Doc. 24-3 at 74.)  Plaintiff also said: "At my current location, I truly feel that I am being targeted and harassed by my Store Manager and it is making it a hostile work environment for me." (Doc. 24-3 at 74.)  He concluded with another request for a relocation to another store. (Doc. 24-3 at 75.)

Considering these emails, summary judgment is warranted on the Title VII retaliation claims.  There is no question of fact on this issue, as the evidence is uncontroverted.  To satisfy his burden, Plaintiff had to engage in protected activity under Title VII, and no reasonable juror could conclude from these emails that he did.  Just as in *Davis*, Plaintiff's general reference to a "hostile work environment" or to being "harassed" does not suffice.  As a result, summary judgment on the Title VII retaliation claim is granted, and it is dismissed with prejudice.

The same reasoning and analysis applies to Plaintiff's ADEA retaliation claim. *See Everett v. Cent. Mississippi, Inc. Head Start Program,* 444 F. App'x 38, 44 (5th Cir. 2011) (citing *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir.1992)) ("the prima facie elements of retaliation in an ADEA case are the same as those under Title VII").  Age is not mentioned in Plaintiff's emails.  Again, under *Davis*, the general reference to being "harassed" or to a "hostile work environment" does not satisfy the Plaintiff's burden.  No reasonable juror could review the Plaintiff's two letters and conclude that he engaged in protected activity in connection with the

ADEA.  As a result, summary judgment on the Plaintiff's ADEA retaliation claim is granted, and it is dismissed with prejudice.[7]

### B. FMLA

"The FMLA requires a covered employer to allow an eligible employee up to twelve weeks of unpaid leave a year if the employee suffers from a serious health condition that makes the employee unable to perform the functions of her job." *Smith v. Touro Infirmary*, 642 F. App'x 338, 340 (5th Cir. 2016) (citing 29 C.F.R. § 825.200(b) (2013)).  "The FMLA also prohibits penalizing an employee for exercising her FMLA rights." *Id.* (citing 29 C.F.R. § 825.220 (2013)).

The *McDonnell Douglas* standard applies to FMLA retaliation claims. *See Castay v. Ochsner Clinic Found.*, 604 F. App'x 355, 356 (5th Cir. 2015).  To establish a prima facie case of retaliation under the FMLA, the Plaintiff must show: "(1) she was protected under the FMLA, (2) she suffered an adverse employment action, and (3) she either was treated less favorably than a similarly situated employee who had not requested leave or the adverse decision was made because she took FMLA leave." *Smith*, 642 F. App'x at 340. (citing *Hunt v. Rapides Healthcare System, LLC,* 277 F.3d 757, 768 (5th Cir. 2001)).  "The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Castay*, 604 F. App'x at 356 (citing *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 390 (5th Cir. 2013)).  The burden then shifts back to the employee, though the Fifth Circuit has not yet decided whether the "mixed motive" standard applies or the "but-for" standard. *See Castay*, 604 F. App'x at 356 & 356 n. 2 (citing *Ion*, 731 F.3d at 390) (applying mixed motive analysis but noting the unresolved issue in the Fifth Circuit).

---

[7] Because of the Court's finding, the Court need not reach the other issues related to the Plaintiff's Title VII and ADEA retaliation claim.

The Court finds that, without question, summary judgment is warranted.  At his deposition, Plaintiff testified that the two emails to corporate in June and October 2013 were the only reasons he was retaliated against. (Doc. 24-3 at 15; Doc. 24-3 at 62.)  Plaintiff was specifically asked if Defendant retaliated against him for taking FMLA leave, and Plaintiff replied, "I don't believe I was being retaliated because I took leave." (Doc. 24-3 at 15; Doc. 56-3 at 3.)

Thus, Plaintiff's claim clearly fails.  Plaintiff has not satisfied his prima facie burden of proving that "[]he was either treated less favorably than a similarly situated employee who had not requested leave or the adverse decision was made because []he took FMLA leave." *Castay*, 604 F. App'x at 356.  There is no evidence in the record demonstrating either.  In fact, Plaintiff's own admissions show no FMLA retaliation whatsoever.  On this basis alone, Plaintiff's FMLA retaliation claim fails and is dismissed with prejudice.

Even if Plaintiff had proven a prima facie case (which he hasn't), Defendant has brought forward a legitimate, non-discriminatory reason for any remotely conceivable adverse employment actions taking place after Plaintiff returned from leave.  For the disciplinary notice, the Defendant has shown that Plaintiff committed a workplace violation with Berda Cage and that Defendant meant to give this notice to him before he took leave. (Doc. 24-1 at 6–7.) Plaintiff's transfer to a different store was, as noted above, requested by Plaintiff (and, in any event, it was, as explained above, not an adverse employment action). (Doc. 24-1 at 8, 10, & 11; Doc. 24-3 at 75.)  And Plaintiff's termination was a direct consequence of the Sabrina Allen incident, detailed extensively above.

Thus, the burden shifted back to the Plaintiff, and he has not met it.  Plaintiff has not shown that his medical leave, or discrimination related to it, was the "but-for" cause of any

alleged adverse employment actions or that it was even a motivating factor in any such action.

For this additional reason, Defendant's motion for summary judgment on Plaintiff's FMLA

retaliation claim is granted, and it is dismissed with prejudice.

### V.    Plaintiff's State Law Claims

#### A.  Intentional Infliction of Emotional Distress

In *White v. Monsanto Co.*, 585 So. 2d 1205 (La. 1991), the Louisiana Supreme Court laid

out the standard for intentional infliction of emotional distress as follows:

> [I]n order to recover for intentional infliction of emotional distress, a plaintiff
> must establish (1) that the conduct of the defendant was extreme and outrageous;
> (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the
> defendant desired to inflict severe emotional distress or knew that severe
> emotional distress would be certain or substantially certain to result from his
> conduct.

*Id.* at 1209.  The Louisiana Supreme Court continued by describing the type of conduct falling

under this tort:

> The conduct must be so outrageous in character, and so extreme in degree, as to
> go beyond all possible bounds of decency, and to be regarded as atrocious and
> utterly intolerable in a civilized community. Liability does not extend to mere
> insults, indignities, threats, annoyances, petty oppressions, or other trivialities.
> Persons must necessarily be expected to be hardened to a certain amount of rough
> language, and to occasional acts that are definitely inconsiderate and unkind. Not
> every verbal encounter may be converted into a tort; on the contrary, "some safety
> valve must be left through which irascible tempers may blow off relatively
> harmless steam."

*Id.* (citations omitted).  While "[a] plaintiff's status as an employee may entitle him to a greater

degree of protection from insults and outrage by a supervisor with authority over him than if he

were a mere stranger," the Louisiana Supreme Court also cautioned:

> On the other hand, conduct which may otherwise be extreme and outrageous, may
> be privileged under the circumstances. Liability does not attach where the actor
> has done no more than to insist upon his legal rights in a permissible way, even
> though he is aware that such insistence is certain to cause emotional stress. Thus,

32

> disciplinary action and conflict in a pressure-packed workplace environment,
> although calculated to cause some degree of mental anguish, is not ordinarily
> actionable. Recognition of a cause of action for intentional infliction of emotional
> distress in a workplace environment has usually been limited to cases involving a
> pattern of deliberate, repeated harassment over a period of time.

*Id.* at 1210 (citations omitted). The court also stated: "The distress suffered must be such that no reasonable person could be expected to endure it. Liability arises only where the mental suffering or anguish is extreme." *Id.*

The Court has reviewed the facts in the record and concludes that Plaintiff has failed to demonstrate a genuine issue of fact on the issue of intentional infliction of emotional distress. Even accepting Plaintiff's complaints about his workplace are true, the Court finds that no reasonable juror could find that any of Defendant's employees' conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  Plaintiff has described the kind of "mere insults, indignities, . . . annoyances, petty oppressions, or other trivialities" that the Louisiana Supreme Court has rejected as a basis for an intentional infliction of emotional distress claim.  Even Gibson's conduct does not constitute the sort of "pattern of deliberate, repeated harassment over a period of time" that is actionable.  No reasonable juror could conclude that Plaintiff satisfied his burden on this issue, and, as a result, this claim is dismissed with prejudice.

**B.  Negligence**.

Plaintiff also brings claims under La. Civ. Code arts. 2315 and 2320.  (Doc. 1 at 10.) Plaintiff alleges that "defendant's negligence resulted in the aforementioned injuries and deprivations pleaded" and that it is "liable to [Plaintiff] pursuant to LA. CIV. CODE art. 2320, for the failure of the employer to prevent the injury he has suffered, and that the employer was

33

able to prevent said injury had the employer exercised due diligence." (Doc. 1 at 10.)  "[Plaintiff]

pleads that the defendant's negligence and/or intentional acts and omissions resulted in the

aforementioned injuries and deprivations pleaded[.]" (Doc. 1 at 10.)

As the Louisiana Supreme Court explained in *White*, La. Rev. Stat. § 23:1032 "makes

worker's compensation an employee's exclusive remedy for a work-related injury caused by a co-

employee, except for a suit based on an intentional act. The words 'intentional act' mean the

same as 'intentional tort.' " *White*, 585 So. 2d at 1208.  These negligence claims clearly fall

short.  Consequently, summary judgment on Plaintiff's claims for negligence under La. Civ.

Code arts. 2315 and 2320 is granted, and these claims are hereby dismissed with prejudice.

## VI.    Plaintiff's Fourteenth Amendment Claims

Plaintiff also asserts, in connection with his § 1981 claim, a claim for the violation of "the

Fourteenth Amendment, guaranteeing equal treatment under the laws applicable to individuals as

to the rights preserved and safeguarded therein." (Doc. 1 at 9.)

Because Home Depot is a private party, "the proof must show significant state

involvement in order to bring an otherwise private concern within the ambit of the Fourteenth

Amendment." *Fulton v. Hecht*, 545 F.2d 540, 541 (5th Cir. 1977) (citations omitted).  "The

protective armor of the Fourteenth Amendment invoked under s 1983 is activated to prevent

deprivation of rights secured by the Constitution and laws only when state action or action taken

under color of state law is present." *Id.* at 541–42.  As the Fifth Circuit has explained more

broadly:

> In essence, for a nominally private individual's conduct to meet the state action
> requirement, there must be a sufficiently close connection between the state and
> the challenged conduct for the actor to be treated as an agent of the state, or the
> conduct to be attributed to the state. This essentially factual determination is made
> by sifting facts and weighing circumstances case by case to determine if there is a

sufficient nexus between the state and the particular aspect of the private
individual's conduct which is complained of.

*Roberts v. Louisiana Downs, Inc.*, 742 F.2d 221, 223–24 (5th Cir. 1984) (citations and quotations omitted); *see also Junior Chamber of Commerce of Kansas City, Mo. v. Missouri State Junior Chamber of Commerce,* 508 F.2d 1031, 1033 (8th Cir. 1975) ("We fail to see that there is present the essential state action . . .. The Constitution applies (only) if the private action complained of is in essence the action of the government."); *Wright v. Pepsi Cola Co.,* 243 F. Supp. 2d 117, 121 (D. Del. 2003) ("the Court concludes that PBG's status as a private entity bars Plaintiff's Equal Protection claim.")

No exquisite analysis is needed here.  Plaintiff has brought forward absolutely no evidence connecting any of Defendant's conduct to any state action.  As a result, summary judgment on Plaintiff's Fourteenth Amendment claim is granted, and this claim is dismissed with prejudice.

**VII.    Conclusion**

Accordingly,

**IT IS ORDERED** that the *Home Depot's Motion for Summary Judgment* (Doc. 24) filed by Defendant The Home Depot U.S.A., Inc. is **GRANTED**, and all of Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE.**

Signed in Baton Rouge, Louisiana, on <u>March 22, 2017</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**